UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOREEN BLANCHARD, | No. 1:19-cv-00628-GSA |
| Plaintiff, | |
| v. | **ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

**I.     Introduction**

Plaintiff Doreen Blanchard ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1] *See* Docs. 10 and 13.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 5 and 6.

1

## II. Procedural Background

On July 7, 2015, Plaintiff filed the pending application for disability insurance benefits alleging disability beginning June 15, 2013.  AR 31.  The Commissioner denied the application initially on January 7, 2016, and following reconsideration on March 10, 2016.  AR 31.

On March 22, 2016, Plaintiff filed a request for a hearing.  AR 31.  Administrative Law Judge  Matilda Surh presided over an administrative hearing held on February 12, 2018.  AR 71-90.  Plaintiff appeared and was represented by an attorney.  AR 71.  On April 12, 2018, the ALJ denied Plaintiff's application.  AR 31-41.

The Appeals Council denied review on February 26, 2019.  AR 5-11.  On May 8, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

## III. Factual Background

### A. Medical Records

The record includes notes of Plaintiff's medical treatment at Community Foundation Oakhurst Medical Group from March 2013 to August 2016.  AR 312-464, 542-45, 611-45.  For the first time in June 2013, Plaintiff reported daily back pain following a water slide accident.  AR 338, 459, 460.  She described the pain as severe shooting and burning.  AR 338.  The pain did not radiate and was aggravated by sitting.  AR 338.  Dianne Sachau, M.D., prescribed Norco (hydrocodone and acetaminophen).  AR 339.  At Plaintiff's next visit, Dr. Sachau added cyclobenzaprine (Flexeril).  AR 345.  In July 2013, medical assistant Randii Avina noted that the prescriptions provided only mild relief.  AR 355.

Magnetic resonance imaging of Plaintiff's lumbar spine in July 2013 indicated (1) mild acute/subacute compression fracture at L1; (2) acute/subacute small focal compression fracture of the superior endplate at L3; (3) mild degenerative changes of the lumbar spine with disc bulging and neural foraminal narrowing; and, (4) central broad-based  disc protrusion of focal bulging disc at L1-L2 indenting on the thecal sac.  AR 458-59.  X-ray studies of Plaintiff's lumbar spine in September 2013, indicated (1) a stable mild end plate compression fracture at L1; (2) no

2

subluxation on flexion/extension views; (3) stable diffuse spondylosis; and, (4) a small acute/subacute compression fracture at the superior endplate of L3.  AR 364.

Martin Rindahl, M.D., noted that Plaintiff was most comfortable standing, but that chronic degenerative changes of her legs and feet precluded standing for protracted periods.  AR 460.  Although other options existed, Dr. Rindahl recommended conservative treatment.  AR 460. . AR 460.  The doctor could not predict how long the associated pain would last, but in light of Plaintiff's age the L1 fracture would likely heal in time  AR 460.  Because of the limited nature of the L3 fracture, the doctor advised against treatment.  AR 460.  Plaintiff agreed with Dr. Rindahl's recommendation to wait and see whether her pain continued to improve.  AR 460.

In October 2013, Dr. Rindahl's partner, Jeffrey Eric Saavedra, M.D., questioned whether Plaintiff's pain resulted from the fractures or from degenerative arthritis.  AR 463.

In August 2014, Dr. Sachau referred Plaintiff to a vascular surgeon for evaluation of painful veins, and to a pain clinic for her continuing back pain.  AR 430.

From October 2014 through September 2015, Perminder Bhatia, M.D., treated Plaintiff at the Neuro-Medical Pain Center. AR 470-86, 530-41.  Plaintiff, who rated her pain from 6-7/10, sought to discontinue oxycodone, which was constipating.  AR 470.  She was drinking alcohol six to eight times daily.  AR 470.  Dr. Bhatia prescribed the Flector (diclofenac) patch; Lidoderm patches to be applied locally for pain; and, diclofenac and gabapentin cream for her neck.  AR 471.

In December 2014, Plaintiff told Dr. Bhatia that the Lidoderm patches provided relief.  AR 472.  She continued to use oxycodone.  AR 472.  The doctor recommended exercise for bone health and weight maintenance, accompanied by dietary changes for weight management.  AR 473-74.  In January 2015, Plaintiff discontinued all medication after developing a skin rash from Norco and gastric problems from anti-inflammatory medications.  AR 476.

In May 2015,  Plaintiff was doing well with Naproxen.  AR 477.  In June 2015, diclofenac was no longer helping Plaintiff.  AR 479.  A bone scan ruled out arthritis as a cause of Plaintiff's

///

///

pain. AR 480, 483-86. In July 2015, Dr. Bhatia noted that physical therapy was helping Plaintiff significantly.[2] AR 481. The doctor prescribed Percocet for use only if needed. AR 481.

In the fall of 2015, neurosurgeon Henry E. Aryan, M.D., performed a consultative examination at Dr. Sachau's request. AR 508-16. Recounting that the illness arose following a fall in the mountains, Dr. Aryan noted that Plaintiff experienced chronic back pain and occasional pain and discomfort in her legs. AR 508. Physical therapy was not helpful. AR 508. Plaintiff drank whisky, which provided some relief. AR 508. Her medications included Synthroid, hydrochlorothiazide, diclofenac-misoprostol, gabapentin, oxycodone-acetaminophen, lidocaine patch and clobetasol propionate (bulk). AR 508-09. Reported symptoms included chills, fatigue, fever, swelling of legs and joints, weight gain, nervousness, depression and rash. AR 509-10.

Dr. Aryan's September 2015 examination revealed no abnormalities of standing and walking. AR 510. Palpation revealed tenderness along the midline thoracic spine from T1 to T12 and at L1-2; mild tenderness over the lower lumbar spine; and, slight tenderness over the sacro-iliac joints bilaterally. AR 510. Except for 4/5 strength of the right exterior hallucis longus, Plaintiff had full strength in her lower extremities. AR 510. X-ray studies revealed a truncal shift toward the right; well maintained lordosis; mild compression deformity and small anterior spurs at L1; moderate narrowing at L5-S1; and, anterior spurs at L3-4. AR 511. Dr. Aryan diagnosed thoracolumbar scoliosis, lumbar thoracic spondylosis, lumbar radiculopathy, strenosis chronic pain syndrome and nicotine use. AR 512. Dr. Aryan ordered MRI studies to determine whether surgery or injection therapy might be appropriate. AR 512.

In October 2015, Dr. Aryan met with Plaintiff to review the MRI studies. AR 513-16. The doctor diagnosed:

> T2-weighted sagittal images show well-maintained lordosis, Chronic compression deformity is noted at L1 and to a lesser extent at T12. Small posterior disc extrusion noted at L3-4 with slight cephalad migration. Mild loss of disc height at L3-4, L4-5, and more advanced at L5-S1. The foramen are fairly patent throughout on parasagittal images with some narrowing towards the right side at

---

[2] A July 2015 physical therapy progress report indicated that physical therapy was reducing Plaintiff's need for pain medications and improving her range of motion. AR 490.

4

> L3-4, L4-5, and L5-S1.  Axial images at T12-L1 and L1-2 show no significant herniation or stenosis.  Perhaps a very small central protrusion at L1-2 without stenosis.  L2-3, slight disc bulge with high intensity zone.  No significant stenosis.  L3-4, small central disc extrusion.  There is mild foraminal narrowing, right greater than left.  Minimal central stenosis.  L4-5, broad-based disc bulge with no significant stenosis.  The foramen is patent.  L5-S1, no significant herniation or stenosis.

AR 515.

Characterizing the MRI as showing "diffuse degenerative changes" with degenerative changes most notable at L3-4, and chronic compression deformities at T12 and L1, Dr. Aryan recommended against surgery.  AR 515.  "It is still not clear where most of her pain is coming from," he noted.  AR 515.  The doctor referred Plaintiff for additional nonoperative treatments (injections) in addition to the pain medication prescribed by Dr. Bhatia.  AR 515-16.

In November 2015, Rasheed Amireh, M.D., performed a lumbar facet joint injection at L3-4, L4-5 and L5-S-1 bilaterally.  AR 548-49.  The procedure provided 70% pain relief and improved range of motion for several days.  AR 554-57.  In January 2016, Dr. Amireh performed a bilateral lumbar medial branch block at L3-4, L4-5 and L5-S1.  AR 546-47.  The procedure provided no pain relief and did not increase Plaintiff's range of motion.  AR 551-53.

At a follow-up appointment in May 2016, Dr. Aryan was still not certain what was causing Plaintiff's back pain although her response to Dr. Amireh's injections suggested the problems arose from the L3-4 disc.[3]  AR 579, 582.  Epidural injections had provided pain relief and reduced Plaintiff's need for pain medication until she was required to exert herself physically to care for her son, who had been injured in an automobile accident.  AR 57.  The doctor observed good walking, standing and balance; full strength in the lower extremities; negative straight-leg raising; and, mild tenderness over the lower lumbar spine and paraspinal muscles.  AR 581.

Following an MRI study in June 2016, Dr. Aryan diagnosed spinal instability of the lumbar region; discogenic low back pain; annular tear of lumbar disc; and, lumbar spondylosis with radiculopathy.  AR 575-78.  However, the doctor noted that Plaintiff had no severe central

---

[3] The content of Dr. Aryan's notes suggests that Plaintiff may have received more injections than those for which notes are included in the record.

5

1  stenosis at any point, and that she was having little radicular pain.  AR 576.  The sole remaining
2  option was spinal surgery, but Dr. Aryan advised Plaintiff that surgery presented potential risks
3  and complications; was not likely to result in Plaintiff's being pain free; and that even assuming
4  Plaintiff experienced sufficient pain relief to return to work, she was unlikely to be hired after not
5  working for three years.  AR 576.

6  Beginning in March 2017, Plaintiff moved to primary care physician Asha S. Sidhu at
7  "CMC," where nurse practitioners and physician assistants conducted Plaintiff's periodic visits.
8  *See* AR 585-615.  At the initial appointment with Marie de Masi, P.A., Plaintiff reported that she
9  had been injured four years earlier when she fell about four feet off a mountain and fractured two
10  vertebrae.  AR 609.  In the course of the transition to the new medical practice, Plaintiff had cut
11  her prescription pain medications in half and had obtained Tramadol from Mexico when her
12  oxycodone ran out.  AR 609.  Ms. de Masi noted wheezing in Plaintiff's lungs and advised
13  Plaintiff that smoking likely exacerbated her pain.  AR 609.  Plaintiff agreed to think about
14  quitting.  AR 609.  Ms. de Masi changed Plaintiff's prescription from oxycodone to Norco.  AR
15  609.

16  When Plaintiff saw Sheri L. Oswald, P.A., in April 2017, she was not tolerating Norco.
17  AR 601.  Norco nauseated Plaintiff who was eating poorly and had lost 14 pounds.  AR 601.
18  Instead, Ms. Oswald prescribed oxycodone-acetaminophen and the Flector patch.  AR 602.  By
19  her next appointment in May 2017, Plaintiff was feeling better and was stretching and exercising.
20  AR 598.

21  After bone density studies in August 2017, Ms. Oswald prescribed calcium and Vitamin D
22  supplements and advised Plaintiff to begin weight-bearing exercises to strengthen her bones.  AR
23  588-92.  In November 2017, Plaintiff reported pain in her right elbow.  AR 585.  Her back pain
24  was worse because of the change in weather.  AR 585.

25  In January 2018, Plaintiff transferred care to Dry Creek Medical and Urgent Care, where
26  she was treated by Tony Reid, P.A.C..  AR 646-60.

27  In July 2018, Plaintiff was transported to the emergency department of Madera
28  Community Hospital after becoming intoxicated and expressing suicidal ideation.  AR 47-70.

Plaintiff's blood alcohol level was 0.283 g/dl.  AR 56.  Although Plaintiff allegedly drank to relieve pain not addressed by her prescription pain medications, testing showed no evidence of salicylates, acetaminophen, opiates, benzo diazepam or other prescription medications.  AR 51-52, 56.  Plaintiff was hospitalized on a 5150 hold.  AR 62.

### B.  **Plaintiff's Testimony**

Plaintiff (born March 1964) lived with her husband and teen-aged son.  AR 75.  She had been fired from her job as a dealer at Chukchansi Gold Casino because her back pain resulted in poor performance and excessive absences.  AR 76, 84.

Plaintiff experienced constant pain as well as medication side effects including irritability and difficulty focusing.  AR 76.  Plaintiff testified that she could stand or sit for twenty to thirty minutes before needing to change position, and could walk for about forty minutes.  AR 77.  She needed to elevate her legs four or five times daily for twenty to thirty minutes to relieve the pressure on her back.  AR 77.  She could lift up to eight pounds.  AR 78.  Plaintiff took narcotics and muscle relaxers which made her drowsy, irritable, unfocused and nauseous.  AR 79. Injections and physical therapy provided little relief.  AR 79.  Plaintiff experienced relief from ice, heat and medications.  AR 79.

Plaintiff could perform personal care and hygiene without assistance.  AR 78.  She could do laundry, sweeping, and grocery shopping, and could cook side dishes that did not require standing in the kitchen.  AR 78.   Plaintiff was able to drive.  AR 79. Plaintiff enjoyed being outside, which helped relieve her depression.  AR 78.  She also enjoyed joining her husband when he drove to Fresno from their home in Coarsegold.  AR 79.  She regularly went out to lunch with friends.  AR 84.

Plaintiff's adult function report was generally consistent with her testimony.  AR 239-47.

///

### IV. **Standard of Review**

Pursuant to 42 U.S.. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V. **The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     Summary of the ALJ's Decision

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 15, 2013. AR 33. Her severe impairment was degenerative disc disease of the lumbar and thoracic spine. AR 33. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). AR 36.

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), and was capable of lifting 20 pounds occasionally and ten pounds frequently; standing, walking or sitting for six hours in an eight-hour workday; frequent climbing of ladders, ropes and scaffold; occasional stooping; and, frequent crouching. AR 36. Plaintiff required the ability to alternate sitting and standing at thirty-minute intervals. AR 36.

Plaintiff was unable to perform any past relevant work. AR 40. However, considering Plaintiff's age, education, work experience, and residual functional capacity, jobs that Plaintiff could perform existed in significant numbers in the national economy. AR 40. Accordingly, the ALJ found that Plaintiff was not disabled at any time from June 15, 2013, the alleged onset date, through April 12, 2018, the date of the decision. AR 41.

### VII. The ALJ Properly Assessed the Reliability of Plaintiff's Testimony

Plaintiff contends that the ALJ erred in rejecting Plaintiff's testimony concerning her pain symptoms and limitations. The Commissioner disagrees, correctly emphasizing that applicable law precludes granting disability benefits based on a claimant's subjective representations.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by "clear and convincing evidence." *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "[A] federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775 F.3d at 1098). In this case, the ALJ relies on inconsistency between the testimony and objective evidence that is without support in the record as a whole and in the ALJ's own findings.

Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

///

A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 30. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In reaching a conclusion, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and, any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." S.S.R. 16-3p at *10.

///

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (2001) (quoting *Fair*, 885 F.2d at 602). *See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks and citations omitted).

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of the analysis of the record as a whole, an ALJ properly considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." S.S.R. 16-3p at 6. Because objective medical evidence may reveal the intensity, persistence and limiting effects of a claimant's symptoms, an ALJ must consider whether the symptoms reported by a claimant are consistent with medical signs and laboratory findings of record. *Id.* For example, "reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, pain." *Id.*

In the case at bar, the ALJ began her analysis by summarizing the consistent representations set forth by Plaintiff's sister, Donna Konopacki, in the third-party adult function report, and by Plaintiff in her adult function report, and hearing testimony. AR 37. Although Plaintiff reported that her symptoms and resulting limitations impaired her ability to prepare meals, perform personal care, sleep, complete household chores, do yard work and drive, Plaintiff was still able to lift five to ten pounds, climb one flight of stairs and walk for twenty to thirty minutes before needing to rest. AR 37. Similarly, Ms. Konopacki indicated that Plaintiff experienced constant pain and had limitations of walking, sitting, standing, squatting and bending, but was still able to prepare simple meals, do the dishes and laundry, clean the kitchen, water the lawn, care for her pets, manage personal care, drive and grocery shop. AR 37.

Looking to the medical records, the ALJ acknowledged Plaintiff's impairments but concluded that despite limitations Plaintiff remained able to perform work consistent with a residual functional capacity to perform work subject to the following limitations: lifting twenty pounds occasionally and ten pounds frequently; standing, walking and/or sitting six hours in an eight-hour work day; frequently climbing ladders, ropes and scaffolds; occasionally stooping, frequently crouching; and alternating sitting and standing in thirty minute increments. AR 36, 37. Plaintiff was able to mitigate pain and promote mobility through various means at various times, including medications, spinal injections, physical therapy and application of heat and cold. AR 37-38. The ALJ wrote:

> Throughout the relevant period, some lumbar testing showed the claimant sometimes exhibited tenderness, restricted range of motion, and minimal diminished strength in the lower extremities. However, occupational therapy records show manual muscle testing was found to be normal in the bilateral lower extremities, including negative straight leg raise, Kernig's, FABER, and femoral nerve tests. Additionally, some musculoskeletal exams also contained some of the following findings: normal cervical and lumbar movement, intact deep tendon reflexes, negative Babinski's sign, 5/5 muscle strength in the lower extremities, and normal gait. Therefore, I have accounted for the claimant's allegations of lower back pain and the medical evidence which shows degenerative changes in the lumbar and thoracic spine in finding that the claimant is capable of the residual functional capacity herein.
>
> After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to

>cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

AR 38 (citations to administrative record omitted).

The hearing decision sets forth abundant evidence in the record to support the ALJ's determination that Plaintiff's representations to the agency were not fully reliable. The Court will not second guess the ALJ's assessment of Plaintiff's credibility.

### VIII. Sufficient Evidence Supported the ALJ's Determination

Plaintiff contends that the ALJ erred in rejecting the opinion of physician assistant Sheri Oswald concerning Plaintiff's residual functional capacity. The Commissioner counters that the ALJ appropriately evaluated Ms. Oswald's opinion as an "other source," as required by applicable regulations and opinions. The Court agrees with the Commissioner.

#### A. Medical Opinions

##### 1. Agency Physicians

On initial review, J. Frankel, M.D., opined that Plaintiff was capable of light work. AR 96. Psychologist H. Bilik, Psy.D., opined that Plaintiff had no significant mental health impairment. AR 96.

On reconsideration, D. Tayloe, M.D.,[4] agreed with Dr. Frankel's assessment that Plaintiff was capable of light work. AR 109. R. Paxton, M.D., agreed that Plaintiff had no significant mental health impairment. AR 110.

##### 2. Consultative Psychiatric Opinions

In December 2015, psychologist Mary Lewis, Psy.D., performed a consultative psychiatric examination of Plaintiff. AR 519-24. Other than nicotine dependence, Dr. Lewis identified no significant mental health impairments. AR 523-24.

Psychologist Jerry R. Livesay, Ph.D. performed a second consultative examination in September 2017. AR 564-72. Complaining of severe pain, Plaintiff stood at all times in the

---

[4] The ALJ refers to this agency physician as Dr. *Taylor* (AR 38) although the initial disability determination was signed by Dr. *Tayloe* (AR 109). The Court will refer to this individual as Dr. Tayloe.

waiting room and during the examination. AR 564. Driving herself to the appointment had exacerbated the pain. AR 564. She reported that she had not slept for 36 hours and was "wiped out." AR 564. Plaintiff reported reluctance to take pain medications and told Dr. Livesay that she had become irritable and jumpy. AR 564-65. She used a pack of cigarettes daily and used wine to settle her nerves, but never had more than two glasses of wine at a time. AR 566. In the course of the examination, Plaintiff frequently digressed to complain of her pain. AR 567.

Dr. Livesay diagnosed generalized anxiety disorder; depressive disorder due to another medical condition; sleep disorder, moderate, chronic; and, tobacco use disorder. AR 569. In the doctor's opinion, Plaintiff's ability to perform simple and repetitive tasks and to accept supervision was unimpaired. AR 569. Plaintiff's ability to perform complex and detailed tasks, and to interact with coworkers and the public was mildly impaired. AR 569. Plaintiff was moderately impaired in her ability to deal with the usual stress encountered in the workplace, to maintain regular attendance, and to complete a normal workday or workweek without interruptions from her psychiatric condition. AR 569. Dr. Livesay noted that Plaintiff's anxiety and agitation due to depression interfered with her social skills and adaption to changes in routine. AR 571.

### 3. Internal Medicine Source Statement

An undated medical source statement signed by an internist, whose signature is illegible, indicated that Plaintiff could lift and carry less than ten pounds; stand or walk less than two hours in an eight hour workday; sit in one-hour intervals; perform limited pushing and pulling with upper and lower extremities; never perform postural activities; occasionally reach and handle; and, frequently finger and feel. AR 499-50. Plaintiff should have limited exposure to temperature extremes, humidity, wetness and hazards. AR 502.

### 4. Questionnaire Completed by Ms. Oswald

On February 7, 2018, less than a week before the agency hearing, Ms. Oswald completed a one-page questionnaire in which she opined that the problems for which she had treated Plaintiff precluded Plaintiff from performing full time work at any exertional level. AR 661. Plaintiff's primary impairments were degenerative disc disease of the lumbar spine, scoliosis,

osteoarthritis, plantar fascial fibromatosis and osteopenia. AR 661. Plaintiff's spinal stenosis and spondylosis was confirmed by magnetic resonance imaging. AR 661.

In Ms. Oswald's opinion, Plaintiff could lift up to eight pounds, but not repetitively. AR 661. She could sit, stand or walk for twenty to thirty minutes at a time for a total of two to three hours in an eight-hour workday. AR 661. During the remaining two hours of an eight-hour workday Plaintiff would need to lie down with her legs elevated, and apply heat or ice on her back. AR 661..

### B. Determining Residual Functional Capacity

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews*, 53 F.3d at 1039-40.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285.  The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831.  In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830.   However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

Physician assistants are not evaluated as if they were physicians.  A physician assistant is not considered an acceptable medical source under 20 C.F.R. § 416.913.[5]  Instead physician assistants are considered to be other sources.  20 C.F.R. § 416.913(d)(1) (listing medical sources that are considered other sources, including nurse practitioners, physician assistants, naturopaths, chiropractors, audiologists, and therapists).  Unlike the opinions of physicians, the opinions of physician assistants are not entitled to special weight.  An ALJ may reject the opinions of other sources by giving "reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).  Factors used to evaluate a physician assistant's opinion include: (1) examining relationship; (2) length of treatment relationship and frequency of examination; (3) supportability of opinion; (4) consistency with the record; (5) specialization; and (6) other factors supporting or contradicting the opinion.  20 C.F.R. § 416.927 (c) and (f)(1).  Plaintiff concedes that Ms. Oswald is properly considered an "other source" under the regulation.  Doc. 10 at 9.

---

[5] The Social Security Administration has recently adopted new rules applicable to claims filed after March 27, 2017, which expand the category of acceptable medical providers to include, among others, physician assistants. 20 C.F.R. §§ 404.1502(a)(6), (7), (8); 416.902(a)(6), (7), (8) (2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). The revisions do not apply to Plaintiff's claim, which was filed July 7, 2015.

**C.     The ALJ Properly Analyzed Evidence in the Record as a Whole**

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

In this case, the ALJ determined at step two that Plaintiff's alleged mental health impairments were not severe. Plaintiff does not challenge that determination in this action. Accordingly, the ALJ appropriately determined Plaintiff's residual functional capacity based on her only severe impairment: degenerative disc disease of the lumbar and thoracic spine.

In addition to the medical treatment evidence, the ALJ gave substantial weight to the opinions of Drs. Frankel and Tayloe, which she found to be based on the medical record available to them along with applicable provisions of Social Security disability law. AR 38-39. Moreover, the opinions were supported by the medical record as a whole which documented both degenerative changes of Plaintiff's thoracic and lumbar spine, and the course of treatment as Plaintiff's condition developed. AR 39.

The ALJ gave little weight to the internal medicine medical source statement, to which the ALJ assigned a date of August 29, 2015. AR 39. The ALJ found the statement to be overly restrictive and lacking any explanation for such extreme restrictions. AR 39. Viewed in the contest of the record as a whole, the source statement was inconsistent with evidence of the activities Plaintiff was performing in her daily life; her positive response to medications, injections and therapy; negative results on straight leg raising and other objective tests assessing degenerative disc disease; and, multiple observations of normal strength and range of motion. AR 39.

The ALJ also gave little weight to Ms. Oswald's opinion, writing: "This opinion is given little weight as it is based on a one-time examination of the claimant, does not provide an adequate explanation for the opinion, and is not supported by the medical evidence of record

///

showing relatively normal musculoskeletal examinations and treatment with injections, physical therapy, and medication." AR 39 (citations to administrative record omitted).

Plaintiff correctly contends that Plaintiff saw Ms. Oswald on five occasions between April 27 and November 9, 2017, not the single instance noted in the hearing decision. The Court is not persuaded this mistake constitutes reversible error. Proportionately, Ms. Oswald's treatment of Plaintiff is a tiny portion of the extensive testing and treatment documented in the record from 2013 to 2018. Plaintiff acknowledges that a brief treatment relationship is entitled to less weight than one that was long-term. Doc. 10 at 9. Further, Ms. Oswald's treatment of Plaintiff was limited to medication management and routine general medical care.

More importantly, as the ALJ recognized, Ms. Oswald's one-page opinion is brief and perfunctory, responding in brief phrases to the questions posed and offering no explanation of her opinion that Plaintiff's residual functional capacity is severely limited. Nothing in Ms. Oswald's treatment notes supports her opinion that Plaintiff could only occasionally lift eight pounds if held close to the body, or that Plaintiff could only sit or walk and stand for two to three hours in an eight-hour workday. To the contrary, as the ALJ stated generally, Ms. Oswald's own notes indicated that Plaintiff was in no acute distress (AR 586, 589, 598, 602); understood that she needed a gym membership and personal trainer (AR 588); had normal strength of her upper and lower extremities (AR 589, 598, 602); had normal extremities with no edema (AR 589, 595, 598, 602); was able to stretch and exercise (AR 598); denied fatigue and sleep disturbance (AR 594); denied joint stiffness or pain (AR 594); doing well on pain medications (AR 598); and, had an intact sensory exam (AR 602).

In addition, Plaintiff's and Ms. Oswald's reliance on a laundry list of ailments (degenerative disc disease, scoliosis, osteoarthritis, plantar fibromatosis and osteopenia) does not rehabilitate Ms. Oswald's opinion. Evidence elsewhere in the record ruled out osteoarthritis as the cause of Plaintiff's pain (AR 480, 483-86) and indicated that Plaintiff's scoliosis was mild without attributing any pain to that condition (AR 512, 577). Although Plaintiff's medical records document a longstanding diagnosis of plantar fibromatosis (a disease of the feet), the record includes no evidence that this condition was ever treated in the relevant time period, or that

19

it resulted in any functional impairment.  Similarly, the record includes no evidence that osteopenia had any functional effect on Plaintiff.[6]

Although Plaintiff would have the Court interpret the record and Ms. Oswald's opinion differently,  the Court is not required to accept Plaintiff's characterization of the evidence.  The ALJ fully supported her determination based on multiple medical opinions and the evidence of record.  Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well.  When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner.  *Jamerson*, 112 F.3d at 1066.

### IX.    Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Doreen Blanchard.

IT IS SO ORDERED.

Dated:   **June 7, 2020**                              **/s/ Gary S. Austin**
                                                  UNITED STATES MAGISTRATE JUDGE

---

[6] Osteopenia is reduced bone density that is not normal but is not as reduced as osteoporosis.  Caused by deficiencies of calcium, Vitamin D and exercise, it may be treated with calcium and vitamin D supplementation and regular light exercise such as walking.  Prescription medications are also available.  Gulay Karaguzel and Michael F. Holick, Diagnosis and Treatment of Osteopenia, pubmed.ncbi.nlm.nih.gov/21234087 (accessed June 3, 2020).